We will hear argument first in number 18-1406, Sharpe v. United States, Ms. Elton. I believe I have reserved three minutes of rebuttal time. May it please the court, Rachel Elsby on behalf of the appellant, John Sharpe. There are two issues in this appeal. First, the Court of Federal Claims abused its discretion when it held that Commander Sharpe was judicially estopped from arguing that his back pay and other compensation should be calculated based on his assignment to the Carl Vinson. Second, the court compounded its error when it then looked to calculate and decided in the alternative that it could calculate the back pay and deny career CPA based on other factors beyond the assignment. So if we turn first to the issue of judicial estoppel. Can I ask you, if we were to conclude that the denial of CPA and the San Diego rate for the housing allowance were neither contrary to statute nor arbitrary and capricious, we do not have to reach the question of judicial estoppel? Is that right? The Court of Federal Claims decided the issues in the alternative. So I think you are correct that you can get there with either issue. Obviously, we think that the court was incorrect on both issues, but you can get there that way. And I guess just help me understand this. I guess your brief invited, I think quite rightly, an inquiry into whether the issues were really the same as between the vessel exception to the court-martial requirement and either the CPA or the basic housing allowance. And then in order to figure out whether they were really the same, I found myself pretty much getting to the merits aside from judicial estoppel. Why don't we begin with the two underlying direct merits questions? I can do that. I can turn to that issue. So going to the merits issue, the court acted unreasonably. The issue here is really the application of the constructive service doctrine. And this can be found from the language in Article 15, which is the vessel exception statute, which says that when somebody is reattached, when the judicial punishment or any form of punishment, non-judicial or otherwise, is revoked, you're to return the rights, privileges, and property to that individual. And this court has discussed what that means in the Groves case. The Court of Federal Claims discussed it a little bit in the Holly case. And what you're doing is putting the service member back into the position that they were in at the time of their separation. Here, Commander Sharp, at the time of his separation, was assigned to the USS Carl Vincent and being paid accordingly. He was also receiving career seapay. The secretary at that point had decided, even though the ship was being overhauled and is in dock, that it was paying the service members who were assigned to the ship career seapay. So if we go back to that point in time, applying the constructive service doctrine, you're to award him or to give him for the entire duration of his service because we treat it as though it's uninterrupted. Why would we treat it uninterrupted when the one thing that we know about his assignment to the USS Carl Vincent is that the assignment order itself said, we expect this to come to an end, what is it, August 28, 2008, I think it was. That's right. And so the simple answer is really because that's the rule we've chosen. That under the constructive service doctrine, it is a legal fiction, but it's based on the information you have at that time. And if you look beyond that to the orders terminating at some point in time, which we concede, we don't dispute that at some point his duty station would have changed, but you don't know what it is. But don't we effectively know what it is unless there's something to the contrary? That is, the order said this assignment terminates before the relevant period here, 2008. And so at that point, in the absence of additional information, wouldn't we be indulging in speculation, I mean at least speculation, and indeed something what appears to be contrary to the ordinary course to say that assignment would have continued? Well, what we don't have is an order that actually says the assignment ends. What we know is the typical assignment for a person in Commander Sharp's position is about 24 months. At the point he was separated, he still had that position. It had exceeded 24 months. It was all the way into, I think, about 39 months. I'm sorry, could you explain one thing to me? One way of reading the record is, you are right, we have no idea what would have happened to the appellant in the period of 2008, 2009, up to 2017, where he would have been assigned in all those years. But it seems like we know one thing he would not have been assigned to, and that would have been the USS Carl Vinson, because, as Judge Toronto pointed out, these assignments are typically 24 to 36 months. And I saw something in the record that indicated that someone else had already been assigned to this very position that he had been assigned to starting as early as the summer of 2008. Is that correct? Yeah, they were essentially grooming or training his replacement. That's in the record. So if that's right, that the replacement had already been identified and had already began training as of the summer of 2008, then what indicia is there that would suggest that Sharp would have gone back to the Carl Vinson in 2009, given that his replacement was already in place as of 2008? Yeah, the argument isn't that he would have gone back to the Carl Vinson. It's that that's the only assignment he had at the point in time where he was separated. And so that's all that we have to look forward and fill in the gap of eight years when he was wrongfully separated from the Navy. The case out of the Federal Claims Court, the Hawley case, is particularly helpful in this overseas housing allowances for being assigned to Germany. And everybody knew that his assignment to Germany was going to end during the period of a separate separation. But the court said, we can't deduct that from the back pay that we're allowing because the only assignments we have in place, the only fiction we know, is the one that was actually there at the time of the separation. And so to fill in the gap, I mean, in Commander Sharp's situation, it would be likely, more than all this pay would have been commensurate with somebody who's assigned duty station, is Washington, DC. But the government and the Navy have now argued that he's entitled to that money. What they're trying to say is that he's placed in kind of this almost temporary or fictional assignment place, which is really not what the constructive service doctrine instructs us to do. It's to restore the rights, privileges, and property that somebody was receiving at the time of their separation. And the only facts we have to go by there as to what that is, really is his assignment to the Carl Vinson. That was his permanent duty station at the time he was separated. And that's even though the assignment itself seems to say, was it PRD? Is that probable rotation date or something? June 20, 2008? That's right. Yeah, it's expected, and I think everyone acknowledges that it was expected that he would be rotated. But for the unlawful separation, he would have been rotated. But it didn't happen that way. Was there anything comparable to that in the Holley case that is an actual finding or document attached to the assignment to Germany that said this is expected to come to an end by virtue of as part of the initial assignment? That was in the Holley case. I'm just finding it for you. Well, I can look at that. Do you think that we are not entitled, or more possibly, that we are required to assume the correctness of the CPA that he was receiving before he was discharged? I think you are. And the Groves case from this court talks a little bit about that. That was a doctor who was receiving variable special pay at the time of their separation. And the Court of Federal Claims had found that upon being reattached, that that doctor was not entitled to continue receiving the variable special pay because they weren't still practicing medicine during the time of the separation. And the court said, no, you were receiving that at the time of the separation, or Dr. Groves was receiving that at the time of the separation, and they'll continue to get it because the only reason it stopped was because of the separation. There was no other reason for it to have stopped. So Commander Sharp is very much the same. He was receiving the CPA at the time of his separation. Somebody had made the decision that these individuals assigned to the Carl Vinson are going to receive this compensation even though it's in dock. And the only reason, just like in Just so I understand, there isn't actually a plausible reason why Commander Sharp should have been receiving CPA when Carl Vinson was not out to sea. It was on land. Is that fair to say? I don't know that it's fair to say. I don't want to kind of misstate something that's a little bit out of my expertise. But somebody, the Secretary of the Navy, had made a decision, a decision that's entitled to this compensation. Now, if the Secretary had decided to look at that before he was separated and said, you know what, we shouldn't be giving these people CPA, the boat's here, they could have terminated it, and that would have been virtually unreviewable by a court. You're saying, Ms. Elsby, even assuming for purposes of argument that it was error to give Mr. Sharp or Commander Sharp CPA, the fact that he was receiving it at the time of his separation, since we now go back and put him in the place he was in when he was separated, he's entitled to the CPA. Even if one could make an argument that it was error. I think that's right. And I think we have to assume it wasn't error because we're not presented with anything that suggests it was, other than arguments that are made after Dr. Sharp has been reattached. And they didn't go back and say, for the time where you were active and assigned to the Carl Vinson, we're going to revoke that CPA. They actually just terminated it at the point of his separation. So it really is the case that his CPA was terminated because of the separation, not because of any other factors. I saw a document, I guess it's this document referred to as the Bourne Memorandum, that says that Mr. Sharp's assignment to the Vinson would have ended, no matter what, no later than December 30th, 31st of 2009. And so would that mean that his CPA would have ended at that point because he was going to be... I think that's part of the problem. That's why we have the rule that we have. We don't know where he would have been assigned next. I think we all probably suspect it would have been Washington, DC, but we don't know that. And so that's why we've created this rule under the constructive service doctrine that you say, you take the service member as you found them when they were separated, and you give them the pay. And I know the government has argued that this is potentially some sort of a windfall. It's not a windfall to say, pay him as he was at the time he was separated. He lost eight years of his career. So there could have been all sorts of other promotions, transfers, and sorts of things like that in this case that we'll never know and that Commander Sharp will never receive the benefit of. All he's asking for is the compensation he received at the time of his separation that was terminated because of the separation. Can you take a minute and a half or something just to make your central point about judicial estoppel, which I diverted you from earlier? Sure. I see I'm into my time, but I'm happy to do it. The real issue here is that the arguments were not inconsistent. From the beginning to the end, Commander Sharp has always accepted the position. He was assigned to the Carl Vinson. He did not physically work on the Carl Vinson on a day-to-day basis. The boat was in dry dock. He was in an office building. The only thing that changed is how you weigh those facts under two different legal analyses. So for the purposes of the vessel exception, whether you weigh the assignment, whether that gets full credit when you're trying to determine whether he's attached to or embarked in a ship, and then in the other case, whether you weigh the factors the same or not, and we have argued not, when you're looking at what it means to restore all rights and privileges. So these are different legal questions and the only argument was whether the evidence, whether the facts weigh differently. That's not making an inconsistent argument. It would be almost like saying if you're looking at, you know, written description and obviousness, they have some common underlying facts, but different facts are going to be dispositive for different, for written description than the facts that are going to be dispositive in obviousness. It's two different legal questions and so it should be perfectly acceptable to say that the facts weigh Good morning, Your Honors, and may it please the Court. Commander Sharp wants to, I think, go back to that point in 2009, but only with respect to certain things that are favorable to him. For instance, if we do go back to 2009, he wasn't yet promoted to the rank of And the pay commensurate with that retroactive promotion paid by the Navy. So is that promotion, I'm not going to use a precise term here, one that he would have gotten in due course, or was there some substantial element of either competition or discretion or the like? Because I know in the personnel world, we separate the kinds of, in the restoration after a reversal of a removal, those things that involve uncertainty from those that are a matter of course. I think there was, there would have been some discretion in the promotion, but he would have been up, had he not received the nonjudicial punishment that was sort of a mark on his record and leading to the separation proceedings, he would have been up for that promotion. I think it's sort of an up or out type system. And he, there's an indication in the record that he was going to get promoted to that particular status, correct? Certainly. Just like there's an indication in the record that he would have finished his rotation in June of 2008, because these are 24 to 36 months. And nobody's disputing that that was going to happen. So that's not part of this appeal. The promotion? Right. That's true, Your Honor. I'm simply using that to demonstrate that taking Commander Sharp and freezing him in time in 2009 is not what happened. And Commander Sharp certainly argued that that shouldn't happen with respect to the promotion. And that, to some extent, dovetails with this judicial estoppel argument that we – that's the first issue, is that Commander Sharp argued one thing with respect to the separation when it was in his favor and then turned around and argued a different point to try to get BAH and career CPA after his nonjudicial punishment had been voided. He argued consistently all the way through, both during the punishment phase as well as the back pay phase, that he was assigned to the USS Carl Vinson. He said that he was assigned to the Carl Vinson, but he argued that that assignment was a technicality and that the Board of Corrections should ignore that technical on-paper assignment, as he called it, and should focus on the practical factors, where he worked, where he lived, where he stood watch, where he even served his punishment, where his hearing was. And the board accepted that position. The board said, okay, we're not going to look just at your technical on-paper assignment. We're going to look to the broad circumstances. And it ruled in his favor. And then he turns around and says, completely disregard all those other circumstances and look solely to the nature of the technical assignment. Let me state how I think I understand Ms. Selsby's argument, or at least one version of it. The vessel exception is all about an important practical consideration about whether you're going to do a court-martial when somebody is, you know, in the middle of the South Pacific. And so it plays a, that the purpose that drives application of that is one that properly led the board to conclude that that exception was not applicable in his circumstance when he was sitting on land. The purpose and different legal traditions behind either the CPAY or the housing allowance are quite different, I think. I mean, that is, this is, I think, the argument. And that as to CPAY, among other things, the secretary had been granting it to him when he was in this condition. And there are important stability reasons to have a default rule that says that continues unless something changes. Nothing has changed. Something similar on the housing allowance. So with the different legal frameworks, maybe the role of the reality of on water versus not on water would change. Two points on that, Your Honor. First, judicial estoppel, unlike issue preclusion, looks at the party's positions. It's sort of a cousin of issue preclusion, but it looks at what position the party took to prevent it from essentially speaking out of both sides of its mouth and getting something on the one hand and then disavowing that position when it's convenient. And so it looks to the issues on which the party took the position. If one states the vessel exception position as, I was never on the water and for purposes of the vessel exception, that is decisive. How is that inconsistent from saying, I was never on the water, but for purposes of the sea duty provision and housing allowance, that actually doesn't matter? I think that's slicing it a little too finely, Your Honor. And I think if you look at the cases we cite in the disability discrimination context, the same argument could be made that, oh, somebody is disabled for purposes of receiving disability compensation, but then they're considered to be able to work for purposes of filing a discrimination suit. But the courts have uniformly applied judicial estoppel in that circumstance and said, you took the position that you're unable to work when you were getting disability, and now you're trying to get a discrimination claim saying that you were able to work but were discriminated. And that is something that the courts routinely preclude litigants from switching midstream. Same thing here. I mean, if you make the issue so narrow that for the purposes of the vessel exception, Commander Sharp argued that his technical assignment should not be considered but then for purposes of pay. But I think if you look more broadly at his position that he took before the board and that he's taking now, the inconsistency becomes apparent. He was arguing that he should be treated as though he was on land, even though, Your Honor, this is another point I'd like to point out. On the issue of CSP, he was being paid CSP. That is true. But at the time, the Navy was treating him as though he was on a ship. And that's why it took away his court-martial and gave him the nonjudicial punishment. And he turns around and he says, you shouldn't have done that. You shouldn't treat me as though I'm on a ship. I was never on a ship. I never ate there. I never slept there. I never served watch there. And the Navy acquiesces and says, sure, we'll treat you as though you're not on a ship and voids his nonjudicial punishment. And then he turns around and says, well, now you have to pay me as though I was on a ship. Why was he being paid career CPA before he was terminated? So he was being paid career CPA. Let me just make sure I understand your question. There was a period of time. So up to 2007, he was being paid career CPA as a public affairs officer assigned to Carl Vinson. Then in 2007— Even though he was in an office building. Because the Navy was viewing him as being assigned to a ship. I think the Navy was paying career CPA to folks even though the ship was in dry dock because there's still some— Is that standard policy? Every time you're assigned to a ship, you get CPA regardless of whether this ship is out to sea or dry dock? No, there are distinctions between certain ships. I think it's the default rule that for a seagoing ship, even if it's in dry dock, because sailors oftentimes still stay on the ship. You still are sleeping in these tight quarters. You're eating on the ship. But he wasn't. He was not. So what did you mean? You were about to say the default rule is and then you interrupted yourself. I think the default rule for this type of ship—well, I shouldn't say default rule. I think in this case, the Navy, even though the ship was in dry dock, was paying career CPA. Commander Sharp was not sleeping on the ship or eating on the ship or doing any work on the ship, but he was, by virtue of his assignment, getting career CPA. Through 2007, when he received the nonjudicial punishment, and then he was in these administrative proceedings that lasted about two years. Even though his rotation was set to end in 2008, he was just kind of stuck in administrative limbo and continued receiving CPA. So I think if his rotation had ended, as it was supposed to in 2008, and he was assigned to, say, Washington, D.C. or somewhere else, career CPA would have terminated. What if theoretically, hypothetically, the USS Carl Vinson had remained in Norfolk, never went to San Diego, and was still in Norfolk today and still dry docked today? And wouldn't—and let's also assume for purposes of my hypothetical that Commander Sharp has been reassigned to the Carl Vinson instead of being reassigned to D.C. Sorry, this hypothetical is getting long. Just for the CPA, wouldn't you agree that Commander Sharp ought to be getting all of the CPA in light of Groves? Well, because then we would be giving him what he had been getting in an uninterrupted way, and there's no reason to believe he wouldn't have continued to get CPA just as he had been getting CPA for the years before he was removed. I think even in that—well, I guess it is the hypothetical that despite the fact that these rotations are 24 to 36 months, he was— The Navy has reassigned him to Carl Vinson. So that's indicia that the plan was that he was always going to be at the Carl Vinson. And the Carl Vinson remained in dry dock? Yes. And so the question is, should he continue receiving CPA? Right. I think that's a different question, obviously, than here. I think in the absence of anything else, if you look at his earning statement prior to separation, you see the line for CPA, and nothing else has changed, then yes, he should be getting CPA. However, if you then start looking and seeing, well, did he get promoted? Did he take a position that he shouldn't be considered to be on the ship? In that instance— But you're saying consistent with Judge Chen's hypothetical, it would make sense for him to continue to receive the CPA. To the extent that he was receiving it. To the extent of the hypothetical. Service members were receiving it even though the ship was in dry dock. Let me ask you, is it the Navy's position that it was error to pay Mr. Sharpe, Commander Sharpe, CPA? Your Honor, that's what the District Court—the Court of Claims found. And yes, the Navy's position is that he was not—he should not have been paid CPA. And the Navy—and this is where it's different from the— Before he was terminated. I think that was Judge Chen's question. Before he was terminated. That's a good clarification, yeah. In other words, during the period before any problems arose and when he was there receiving CPA as the public affairs officer, does the Navy say that CPA during that period was erroneous? Given his assignment to the bank building and the fact that he never set foot on the ship, yes. Now let me ask you one thing. Turning back to the issue that we were discussing at length with Ms. Helvey when she was up there. You start from the premise in these cases that when someone is reinstated, they go back to the position they were in at the time of the alleged improper separation. And I guess it's the government's position here that, okay, we do that. And when we put him back in the place he was in, that's not only the physical place, but also the whole panoply of circumstances are put back in place. Namely, when his tour on the Vinson would have ended, etc. Is that the government's position? In other words, when he goes back, we do this sort of constructive putting him back in place. We also put him back in place, and one of the circumstances of being back in place is that his tour on the Vinson would have ended. Is that correct, the government's position? Yes, although I think to the extent, the government's position is that we don't try to project some sort of hypothetical career path for him. We put him back as best we can, given the unique circumstances of this case. But the government would say we're not projecting hypotheticals when we say the rule was that his tour of duty was to end. That's correct. The government would say that's not a hypothetical or a conjecture. That's correct, and I think that's what distinguishes this case from the Hawley case that, Judge Stronto, you were discussing. There is no indication that the overseas assignment was going to end, and in fact, there's a footnote, footnote three, that talks about how service members were encouraged to apply for additional overseas assignments. So there's no firm date in Hawley, which was also reversed by this court on appeal. For other grounds. For other grounds, yes. But there is no firm date in Hawley that everyone agrees would have ended his rotation. But it's still unquestionable that these overseas assignments don't last forever. Sure, but the footnote says that the service members were encouraged to apply for additional overseas assignments. Here we don't have any indication that absent this 24 to 36 month rotation, they tried to put public affairs officers back on carriers. These are fairly unique. Maybe that's just an assumption. Everybody wants to go to San Diego. John, one question. If it was in this repair condition, how did the Vinson get to San Diego? Well, in 2010, when it moved to San Diego, it had been fixed. I mean, this was an overhaul of, I think, the nuclear. Did it go through the Panama Canal to go around Cape Horn? I'm sorry. I don't actually know, Your Honor, the physical route. Last question. In 2008, did a new public service officer actually replace Commander Sharp in that very position he occupied for the two years prior? Yes, Your Honor. And this is an appendix 2606 and 2572. Commander Sharp himself in his submissions to the board says that his numerical relief, that's what they call it in the Navy, his numerical relief had been ordered in, I believe, end of 2007 and was en route and then took over his duties sometime in 2008. Mr. Hummel, what was the second site? You said 2606 in the appendix, and what was the second one? 2572. Okay. Thank you. And also appendix 1011, well, 1011. And both of those talk about the projected rotation date and the numerical relief being ordered. I see I'm over my time, so if there are no further questions, we respectfully request that you affirm on either ground. Thank you. You have three minutes. Just one question. Is your client still in the service? He is. He's here today, actually. Oh, okay. So he's in the military still? He is serving in Washington, D.C. Oh, okay. Yeah. So just three quick points on the Hawley case. The language in Hawley, which I have for you now, is- What's the site? This is at 457, I'm calling, which is 30- I'm sorry, 30- 33 Federal Claims, 457. And it says that the defendant had argued that Hawley was not entitled to the overseas housing allowance at all because defendant's probable career reconstruction shows that before Hawley's illegal discharge from service, he would have received OHA for only another 10 months. So it would have only continued for a certain amount of time. And it's true that there's a footnote that people in his position are encouraged to reapply, but there's certainly no order that said that would have happened or that he would have been stationed there. So we can't assume that, and that's not what the court did. On the C page- Sorry to jump in in your limited remaining time. But at what point would you have a situation where someone in Commander Sharp's position is returned to his previous position and there is a regulation or a rule that says, on such and such a date, you will be terminated from your post on the Vinson? Would you agree that there could be a circumstance where rules and regulations in place would control what would have happened and it would not have been speculation or conjecture? I think if you know their next landing spot, then I'll agree with you. In that situation where you can project what was going to happen next, but here nobody knows what's going to happen next. And so that's why we have this rule that says you have to put them back in the position that they were in, but for the separation and then treat them as though that service went on continuously until there's something intervening that takes its place. And in this case, that didn't happen until 2017 when he was assigned to his new permanent duty station in Washington, D.C. So you're saying there has to be something in place of a very definitive nature that would compel the conclusion and it would be a regulation or a rule that Circumstance A would have ended and Circumstance B would have begun. Is that what you're saying? That's right, and I think the reason for that is otherwise you're putting somebody into kind of a strange position where you're assuming some other fact to replace the assignment, the permanent duty station. And in that scenario, in that world, you could kind of choose from anywhere. You're not necessarily giving somebody credit for being in Norfolk. You could have said, well, maybe he actually lived in North Carolina. Are you now going to assign the rate based on the housing allowance for North Carolina? It's all speculative, and that's exactly what this rule is. And you're saying what I hypothesize, that circumstance doesn't exist here. Why would you say it doesn't exist here? Because he didn't receive new orders until he came back into the military and those new orders placed him in Washington, D.C. So until you have an assigned permanent duty station other than the USS Carl Vinson, your payment has to be according to being assigned to the Carl Vinson. And if I may just take one more minute to make one point, the argument was made before that the Army took the position that the original award of CPA was incorrect. Maybe. Maybe, sorry. I think that was actually incorrect. If you look at the Born memo, which is at JA 859, it kind of clearly refutes that proposition. Thank you. Thank you very much. Case is submitted. Thank you.